## Charles B. Farwell v. Bessie McLeod Sturges and James H. Wilkerson, Administrator of William Sturges.

1. STATUTES—*Construction of the Act to Enable Parties to Avoid Delay in the Administration of Justice.*—The provisions of section 1 of the " act to enable parties to avoid delay in the administration of justice," requiring the agreement by which matters in controversy are submitted for determination " to be entered of record," are directory only, and not jurisdictional.

2. SAME—*Construction of the Clause " To be Entered of Record."*— It is a sufficient compliance with the provisions of section 1 of the act, " to enable parties to avoid delay in the administration of justice," requiring the clerk to enter the agreement of submission of record, to spread the same upon the records of the court as a part of the final decree.

3. ACT TO ENABLE PARTIES TO AVOID DELAY IN THE ADMINISTRATION

Farwell v. Sturges.

OF JUSTICE—*What to be Submitted Under.*—All matters which under our system are cognizable either at law or in equity, are susceptible of submission to the judge of the court for determination under this statute.

4. EQUITY PRACTICE—*Ordering Money Paid to Persons Not Parties to the Suit.*—Moneys found to be equitably due from one to another of the parties to the proceeding, may be ordered, in a suit in equity, to be paid to one who is not a party to the suit, but who, as between himself and the party to whom the money is found to be due, is equitably entitled to it.

**Submission Under the Act to Avoid Delay in the Administration of Justice.**—Error to the Circuit Court of Cook County; the Hon. MURRAY F. TULEY, Judge, presiding. Heard in this court at the March term, 1895. Affirmed. Opinion filed April 22, 1895.

## STATEMENT OF THE CASE.

This was a proceeding wherein certain matters in controversy were submitted to the Honorable Murray F. Tuley, one of the judges of the Circuit Court of Cook County, under the provisions of an act approved June 17, 1887 (Hurd's Rev. Stat. Ill., 1891, Secs. 100 and 101, Chap. 110, entitled Practice), which are as follows:

" Sec. 1. That any two or more persons or corporations may appear in person or by attorney in any Circuit Court (or in the Superior Court of Cook County) and submit to any judge thereof, orally, and without formal pleadings, any matter in controversy, having first entered into a written agreement (to be entered of record) and substantially in the following form, to wit:

In the Circuit Court of —— County.

First. We (here insert names) do hereby mutually agree to submit to Judge (here insert name) of said court, certain matters in controversy between us for his determination, without a jury, he to hear the same forthwith and to enter the judgment or decree of the court therein within (here insert number of days or 'forthwith') days after such hearing is concluded.

Second. That said judgment or decree shall contain a statement as to what matters in controversy were so submitted, and such statement thereof shall be conclusive.

Third.   That no record except of this agreement and of such judgment or decree shall be made as to the matters in controversy so submitted, or as to the proceedings had on the hearing thereof.

Fourth.   That such judgment or decree may be enforced in like manner as other judgments and decrees of such court.

Fifth.   That we each to the other hereby waive all right of appeal from such judgment or decree, and release all errors that may intervene in the hearing of the matter so submitted, and in the entering of the judgment or decree therein, and agree that this release of errors may be pleaded in bar of any writ of error that may be sued out as to such judgment or decree.

Witness our hands and seals, this — day of ———, A. D. ———.

                                          [SEAL.]
                                          [SEAL.]

Such agreement shall be signed by the parties in person or by duly authorized attorney in fact, and when so executed shall be of binding force upon the parties thereto in all the courts of this State.

Sec. 2.   It shall be the duty of such judge to proceed and in a summary manner to hear and determine the matters so submitted, and he shall enter a judgment or decree therein within the time fixed in said agreement, which said judgment or decree shall be final and conclusive, and may be enforced in like manner as other judgments or decrees of such court, but no appeal shall be allowed therefrom."

The agreements recited in the decree here following were never entered of record except as they were spread of record as a part of the decree, and, unless the paper that has been filed here as a supplemental record be treated as a part of the record in the cause, what is contained within the decree comprises all that there is of the record.

The transcript certified to this court by the clerk of the Circuit Court, is as follows:

" In the Circuit Court of Cook County, State of Illinois.
In the matters in controversy between William Sturges

Farwell v. Sturges.

and Bessie McLeod Sturges, separately, of one part, and John V. Farwell, Charles B. Farwell, Abner Taylor and the Capitol Freehold Land and Investment Company, Limited, of London, England, all or either of them, separately or jointly, of the other part.

This cause coming on to be heard upon the agreement of submission herein, which is as follows:

In the Circuit Court of Cook County, State of Illinois.

In the matter of difference between William Sturges, or Bessie McLeod Sturges, of the one part, and John V. Farwell, Charles B. Farwell, Abner Taylor, and the Capitol Freehold Land and Investment Company, Limited, of London, England, all or either of them, separately, or jointly, of the other part.

Submission of controversy to the Hon. M. F. Tuley, as judge of the said court, as provided by statute, and in pursuance of stipulation, following:

STIPULATION OF SUBMISSION.

IN THE CIRCUIT COURT OF COOK COUNTY, STATE OF ILLINOIS.

First.    We, John V. Farwell, Charles B. Farwell, Abner Taylor and the Capitol Freehold Land and Investment Company, Limited, of the one part, and William Sturges on the other part, do hereby mutually, jointly and severally, agree to submit to Judge Murray F. Tuley of said court certain matters in controversy between us for his determination, without a jury, he to hear the same within such reasonable time as may be proper for such hearing, and to enter the judgment or decree of the court therein within a reasonable time after such hearing shall be concluded. (That the matters submitted herein shall include all matters of difference whatsoever between the parties of the one part, or either of them, and the parties of the other part or either of them, excepting only the matters at issue between Bessie McLeod Sturges and the said John Farwell in a certain cause pending in the United States Circuit Court for the Northern District of Illinois.)

All other suits or proceedings of every name and nature between the parties of the one part, or either of them, shall be dismissed, discontinued and withdrawn, without prejudice to the rights of any party hereto.

Second. That said judgment or decree shall contain a statement as to what matters in controversy were so submitted, and such statement thereof shall be conclusive.

Third. That no record, except of this agreement, and of such judgment or decree, shall be made as to the matters in controversy so submitted, or as to the proceedings had on the hearing thereof.

Fourth. That such judgment or decree may be enforced in like manner as other judgments and decrees of such court.

Fifth. That we, each to the others, hereby waive all right of appeal from such judgment or decree, and release all errors that may intervene in the hearing of the matter so submitted, and in the entering of the judgment or decree in bar of any writ of error that may be issued out as to such judgment or decree.

Witness our hands and seals this 23d day of May, A. D. 1892. (Signed)  JOHN V. FARWELL,           [SEAL.]
                        CHARLES B. FARWELL,        [SEAL.]
                        ABNER TAYLOR,              [SEAL.]
                        THE CAPITOL FREEHOLD LAND
                          AND INVESTMENT COMPANY,  [SEAL.]
                        WM. STURGES.               [SEAL.]"

Stipulation between Bessie McLeod Sturges and John V. Farwell, whereby the matters involved in the suit in Marquette county, Michigan, as shown in the pleadings hereinbefore set out, are submitted for adjudication in this proceeding.

It is stipulated between John V. Farwell, by his solicitor, George F. Westover, of the one part, and Bessie McLeod Sturges, joined with William Sturges, of the other part, as follows:

Whereas, on the        day        1891, the said Bessie McLeod Sturges filed her bill of complaint against John V. Farwell, Richard P. Travers and William Sturges in the Circuit Court of Marquette County, in the State of

Michigan, wherein the said Bessie McLeod Sturges claimed a certain interest or equity of redemption in certain lots or real estate, situated in the said county of Marquette and State of Michigan.

And whereas, in the year 1892, the said John V. Farwell, together with Charles B. Farwell, Abner Taylor and the Capitol Freehold Land and Investment Company, limited, of the one part, entered into an agreement in writing with the said William Sturges, whereby, as provided by the statutes of the State of Illinois, the said parties agreed to submit to Murray F. Tuley, a judge of the Circuit Court of Cook County, in the State of Illinois, all matters of difference between the said William Sturges and the said John V. Farwell and others, and each of them, said matters to be heard by the said Murray F. Tuley without a jury.

And whereas, in consideration of the agreements herein contained, the said Bessie McLeod Sturges is to dismiss her said bill of complaint filed in the Circuit Court of Marquette County, in the State of Michigan, as aforesaid.

Now, therefore, it is hereby agreed that the said Bessie McLeod Sturges shall dismiss the said cause pending in the said Circuit Court of Marquette County as aforesaid, and that all the matters in controversy therein, and all the other matters in controversy, if any, between the said Bessie McLeod Sturges and said John V. Farwell, or between said Bessie McLeod Sturges and either of the other parties to the said agreement of submission to the said judge of the Circuit Court of Cook County as aforesaid, shall be and hereby are included within the said submission, and shall be and hereby are submitted to the said Murray F. Tuley, to be heard and adjudged by him at the same time and under the same conditions, specifications and stipulations, as he shall hear and adjudge the matters to be submitted to him by the stipulations of the said William Sturges and the said John V. Farwell and others already entered into as aforesaid.           (Signed)    Bessie McLeod Sturges,
                                    John V. Farwell,
                                    By George Westover,
September, 1893.                              His Attorney.

And the said parties to the said agreements of submission and to the cause being present with their respective solicitors and attorneys, and the court having obtained full jurisdiction of said parties and of the matters in controversy between them, and having heard the evidence, both oral and written, produced and offered by said parties,. respectively, and having heard the arguments of the respective counsel and attorneys, and being fully advised in the premises, doth find, determine and adjudge and decree as follows :

That the matters in controversy between said parties and so submitted by the said parties to the said two agreements of submission for the final determination and adjudication of this court are found, adjudged and decreed to be as follows :

1st. As to the respective right, title and interest of the said William Sturges and the said John V. Farwell, Charles B. Farwell and Abner Taylor, hereinafter referred to as the ' Syndicate,' in and to a certain contract made between the said persons composing said syndicate and Kensington & Company, bearing date the 13th day of July, 1885, which said contract is as follows :

The Kensington contract between Kensington & Co. and John V. Farwell, C. B. Farwell and Abner Taylor, July 13, 1885.

Memorandum of agreement, made on the 13th day of July, 1885, between John Villiers Farwell, of Chicago, in the United States of America, but now temporarily residing at No. 49 Dover street, Picadilly, in the county of Middlesex, merchant; Charles Benjamin Farwell, of Chicago aforesaid, merchant, and Abner Taylor, also of Chicago aforesaid, merchant, of the one part, and Kensington & Co., of No. 1 George street, Mansion House, in the city of London, advertising contractors, of the other part. Whereas, by an agreement made on or about the 1st day of June, 1885, between the said Abner Taylor of the first part, John Villiers Farwell and Charles Benjamin Farwell of the second part, and William Chase Prescott, as manager for

and trustee on behalf of the Capitol Freehold Land and Investment Company, Limited, of the third part, the said Abner Taylor sold, and the company purchased, certain lands situate in the Pan Handle of Texas, therein particularly described, at the price therein mentioned.    And whereas, by an agreement bearing even date herewith, and made after the making hereof between the company of the one part and the said Kensington & Company of the other part, the company agrees with the said Kensington & Company, that the said Kensington & Company shall issue debentures, upon the terms set forth in said agreements. And whereas, John Villiers Farwell, Charles Benjamin Farwell and Abner Taylor, for good and sufficient reasons, are desirous that the said subscription for debentures shall be made as quickly as possible, and have agreed with the said Kensington & Company that in consideration of their entering into the agreements hereinbefore last recited they will allot, or cause to be allotted, or transfer, or cause to be transferred, to the said Kensington & Company, or their nominees, fully paid-up shares in the company, in manner hereinafter provided.    Now it is hereby agreed as follows :.

1.  After setting aside or allotting 13,000 fully paid-up shares, in pursuance of the terms of the agreement of the 1st of June, 1885, in respect to 200,000 pounds worth of debentures, subscribed for in America, and 60,000 pounds worth of debentures to be subscribed for in England, before the prospectus inviting subscriptions for debentures is issued, the parties hereto of the first part shall set aside 37,000 fully paid-up shares, to be disposed of as follows: 3,500 of such shares are to be allotted *pro rata* as bonuses for the applicants for the first 140,000 pounds worth of debentures subscribed for, and 3,500 *pro rata* to the said Kensington & Company, as they may direct, and when the said debentures are subscribed for.

2.    If within six months from the date of the issue of the first debenture prospectus the said John Villiers Farwell, Charles Benjamin Farwell and Abner Taylor shall be of opinion that the subscription for debentures are not being

made sufficiently rapid to meet the needs of the company they shall notify such opinion to said Kensington & Company, and shall thereupon be at liberty to themselves take such measures auxiliary to those of the said Kensington & Company, as they may think fit, until 400,000 pounds worth of debentures shall have been subscribed for, but in respect to the debentures subscribed for wholly in consequence of such auxiliary measures, no shares shall be allotted to the said Kensington & Company under this agreement.

3.  The residue of the said shares shall be allotted to the said Kensington & Company, or as they may direct, in the proportion of one ten-pound share fully paid up for every twenty pounds of nominal value subscribed for in the debentures, as and when the same shall be subscribed for.

4.  If the 260,000 pounds referred to in paragraph 1, or any part thereof, is not raised in manner hereinbefore referred to, the same, or such part thereof as shall not have been so raised, shall form part of the debentures, the subscriptions for which are to be obtained by the said Kensington & Company, and the bonuses of fully paid shares payable in respect thereof, in accordance with the term of the hereinbefore recited agreement of the first of June, 1885, shall be paid to the said Kensington & Company, or as they may direct, but the parties hereto of the first part shall be at liberty to obtain subscriptions for the same; provided always, that if any subscription shall be obtained in Europe otherwise than through the said Kensington & Company, they shall, nevertheless, be entitled to receive the shares they would otherwise be entitled to under this agreement as if they had obtained the said subscriptions themselves.

5.  The said Charles Benjamin Farwell, John Villiers Farwell and Abner Taylor undertake and agree that if, in pursuance of sub-section 2, of article 2, of the hereinbefore recited agreement of the first of June, 1885, they shall demand and receive from the company the whole or any part of the 600,000 pounds debentures, that they will not sell or cause the same to be sold in Europe, except through the said Kensington & Company and under the terms of this

agreement. Provided, however, that the said Charles Benjamin Farwell, John Villiers Farwell and Abner Taylor, may transfer not exceeding 25,000 pounds thereof in payment for stores, machinery or materials supplied to them by any firm, company or person in Europe.

6.  And it is hereby further agreed by and between the said parties hereto, that whereas, the said Kensington & Company are entitled to receive from the company two per cent upon the nominal amount of debentures subscribed for, in pursuance of the agreement, bearing even date herewith, and hereinbefore referred to, the said Kensington & Company shall return to the said Charles Benjamin Farwell, John Villiers Farwell and Abner Taylor, shares to which they, the said Kensington & Company, shall be entitled to under this agreement, to a number equal in nominal amount to the sum received by the said Kensington & Company from the company, as and when they shall receive the same; but this condition shall not apply to the two per cent paid to the said Kensington & Company in respect of any debentures subscribed for, solely through the parties hereto of the first part, in pursuance of articles 2 and 4 thereof.

7.  In the event of any of the applicants for the debentures of the company, desiring to receive interest upon the amount advanced by them at the rate of seven per centum per annum in lieu of five per centum, with a bonus in fully paid shares, then the said Kensington & Company shall not be entitled to receive any portion of the said bonus, which would have been paid to such applicants, but the same shall belong to the said John Villiers Farwell, Charles Benjamin Farwell and Abner Taylor, but Kensington & Company shall be entitled to receive the amount of the shares payable to them in pursuance of this agreement as if the bonus had been paid to the applicants.

As witness the hands and seals of the said parties :

JOHN V. FARWELL,      [SEAL.]

CHARLES B. FARWELL,    [SEAL.]

By John V. Farwell, his attorney in fact.

ABNER TAYLOR,    [SEAL.]

By John V. Farwell, his attorney.

Signed, sealed and delivered by the within named John V. Farwell, Charles B. Farwell and Abner Taylor, in the presence of Traves T. Briant, clerk to Snell, Son & Greenip, solicitors, 1 and 2 George Street, Mansion House, London, E. C.

Which said contract was on the fifth day of March, 1886, assigned by the said Kensington & Company to the said William Sturges; and as to what pay, if any, said Sturges was to receive from the said syndicate, or the members thereof, for his services and expenses in connection with said contract or acts done thereunder, and also as to what interest, if any, said Bessie McLeod Sturges has or had in the contract, or in the remuneration, if any, which the said syndicate was or may be found liable to pay to the said William Sturges in connection therewith.

2d.   As to the liability, if any, of the said Capitol Freehold Land & Investment Company (hereinafter referred to as the Capitol Company) to the said Sturges for services rendered by said Sturges in or about the promotion and organization of said company, or rendered to said company since the date of its organization, or in or about the selling of the debentures of said Capitol Company, or in or about its business, and what claim, if any, said Sturges has to any shares of stock of said Capitol Company.

3d.   How much, if anything, is due and owing to said William Sturges from the said syndicate, or any member thereof, for services performed or expenses incurred for said syndicate, or any member thereof, for services performed or expenses incurred for said syndicate, or for said Capitol Company, in or about the promotion of said Capitol Company, or in or about the sale of its debentures, or in or about the business of said Capitol Company from the commencement of the year 1884 down to the present time, and also what sum of money or other consideration, if any, was due and owing to said William Sturges for services performed during said last mentioned period for the said syndicate in efforts to sell lands for said syndicate, or to raise money by mortgage upon certain lands owned by said syn-

dicate under a certain contract for the building of a state house for the State of Texas, and for services on behalf of said syndicate in connection with the promotion and organization of said Capitol Company, the selling of its debentures and attending to the interests of said syndicate in any other way or manner during said period, or for any services rendered or expenses incurred in any way or manner by the said Sturges for the said syndicate from the year 1883 down to the present time.

4th.   What sum of money, if any, is due upon a certain alleged loan of $140,000, made by the said John V. Farwell to the said William Sturges, for which said Sturges gave his note dated June 24, 1889, payable in one year with six per cent per annum interest, secured by collaterals with power of sale, and collateral securities, being 6,136 shares of stock in the said Capitol Company and seven shares of stock of the Sonora Land Company.

5th.   As to who is the owner and entitled to a certain sum of $18,000, deposited with John V. Farwell & Company or to the credit of said John V. Farwell, which were part of the proceeds of a certain sale made by one Travers of certain property known as a part of the Grace Furnace property, and as to how the said sum of money should be applied in the accounting among the parties hereto; also, as to the amount paid said William Sturges, or to others for him, from time to time, upon account of his said claim for services, in money, stocks, or a transfer of property, real or personal, to, for or on behalf, or at the request of said Sturges.

6th.   As to whether certain eighty lots in Smith Moore's Addition to the city of Marquette, State of Michigan, belonged to the said Bessie McLeod Sturges, or to the said John V. Farwell, or to any other or others of the parties hereto, and as to what claims or equities said John V. Farwell has against said property by reason of the payment of taxes or otherwise.

7th.   As to the rights and equities existing between the said syndicate and the said William Sturges, and as between

the respective parties to this submission growing out of the said mentioned services of said William Sturges and said fifty per cent Kensington contract and a certain rebate agreement connected therewith, and growing out of certain arbitration agreements made between said Sturges and his claims as to the said contract of the Kensington company, which was assigned to him as hereinbefore mentioned.

8th. And all matters in controversy between the parties to said agreements of submission, and their rights and equities respectively in the matters hereinafter concerning which there are any findings or adjudications.

The court finds the substantial facts which are necessary to be set out in this decree to be as follows:

That in 1883, John V. Farwell, Charles B. Farwell and Abner Taylor, known as the 'Syndicate,' were the owners of a certain contract with the State of Texas, whereby, in consideration of 3,000,000 acres of land, to be deeded to them or their assigns by the said State of Texas, from time to time as the work progressed, they agreed to erect a state house or capitol building for said State, according to certain plans and specifications; that in 1883 some efforts were made by the syndicate to raise money for the erection of the state house by a sale of the lands, or by borrowing upon them as security, in the United States, and that John V. Farwell, while in Europe, in that year, made some efforts in the same direction in England, but that all said efforts during said year were failures.

Said syndicate commenced work on the foundation of said state house with money furnished by the syndicate itself, and the evidence tends to prove that by May 1, 1884, the syndicate had expended several hundred thousand dollars in the work, and was very anxious to raise the money necessary for its further prosecution, either by the sale of the land or by borrowing upon the same.

In March, 1884, John V. Farwell, who acted as the financial manager of the syndicate, met the said William Sturges (who was then on his way to Europe to promote certain water works, patented gas and other schemes in which he

was interested) in the city of New York. The parties were well acquainted, on friendly terms, had been interested in several speculative schemes before that time, and said Sturges had become, by reason thereof, indebted to the said John V. Farwell in something more than $100,000. In a conversation that was had with him in regard to the affairs of said syndicate, in connection with the building of said state house, Sturges offered his services to bring the matter to the attention of English investors, and see what could be done in Europe as to selling the lands or raising money upon them by way of security, and proffered to do the same without expense to Mr. Farwell or the syndicate. No definite scheme was formulated, but it was understood between them that the syndicate preferred to give a proportion of the shares of the stock in any company based upon the ownership of the 3,000,000 acres of land, to any person or syndicate who would furnish money to erect a capitol building, rather than to borrow upon any bonds to be issued upon the security of the land.

Farwell furnished Sturges with certain letters of introduction to Stuart & Company and others. Sturges remained in England from the spring of 1884, until the next January, reporting by letter to John V. Farwell his efforts to introduce the scheme and to form a company or corporation to raise the money required, and as to his success in obtaining from time to time, promises to take stock or bonds in connection with any company that might be formed.

And the court finds that Sturges was earnest and diligent in his efforts to float some scheme by which the money could be raised for the syndicate. His only authority was to entertain proposals or schemes and submit the same to the syndicate; he had no authority to bind the syndicate in any way.

In January, 1885, Sturges returned to America and reported to the syndicate what he had done and submitted a scheme for organizing a company, and claimed that he had secured promises from capitalists to subscribe for over $700,000 of the stock of the proposed company. This scheme

did not meet with the approval of the syndicate. The syndicate thereupon determined that John V. Farwell should return to England with Sturges and get up some scheme or plan for organizing a company in England upon a basis which should be satisfactory to said Farwell, the other members of the syndicate giving said Farwell a general power of attorney to act for them.

While Sturges was in England in 1884, the syndicate were making efforts to raise money in America, and also efforts to raise it in Germany, but all such efforts failed, and all attempts further in that direction were abandoned, when it was determined that Farwell and Sturges should return to England.

In March, 1884, the two went to London, and upon interviews with a Mr. Stuart, Mr. Brogden and others, who had become interested in the proposed scheme of Sturges, they were notified that the scheme proposed by Sturges was not acceptable to the syndicate.

The court further finds that various efforts were made and schemes proposed for the raising of the money, varying in amount from three to five millions of dollars, in all of which Sturges assisted Mr. John V. Farwell, and that these efforts resulted finally in the formation of the said Capitol Freehold Land and Investment Company, the preliminary organization of which was made June 1, 1885. The capital stock was to consist of 300,000 shares of ten pounds each, but only 200,000 were to be issued, and one million pounds of bonds to be issued upon the land, which was to be transferred to a trustee as security.

The court further finds that the labors of Sturges in 1884 were utilized in the formation of said Capitol Company, and were of much advantage in that connection.

The court further finds that in getting up the scheme of said Capitol Company the services of one Edward Kensington as a promoter and agent thereof, were obtained largely through the efforts of said Sturges, and that, on or about the 13th day of July, 1885, the said Edward Kensington, under the name of Kensington & Company, made an agree-

ment of that date with said Capitol Company, to obtain subscriptions for the 1,000,000 pounds of debentures (less a small proportion thereof, which it was claimed had already been subscribed), for and in consideration of two per cent commission upon the amount of debentures sold, or subscriptions therefor obtained by the said Kensington & Company, they to pay certain specified expenses of advertising, etc., connected with the selling and promoting the sale of such debentures. This contract will be referred to hereafter as the ' Two per cent Contract.'

The court further finds that on the same day the said syndicate entered into the said contract with Kensington & Company, hereinbefore set forth, by which the said Kensington & Company agreed to take pay for selling said debentures in shares of stock, which contract will be hereafter referred to as the 'Fifty per cent Kensington Contract.'

The court further finds that contemporaneously with the making of the said two contracts a verbal agreement was entered into between the said Farwell, representing said syndicate, and the said Kensington, known as the ' Rebate Contract,' to which agreement the said William Sturges was also a party; by this rebate agreement the profits and emoluments to be received upon the fifty per cent Kensington contract were to be divided between Kensington & Company and William Prescott, John V. Farwell and William Sturges, each to take one-quarter, and that, as soon as the first issue of 400,000 pounds of debentures was floated the agreement should be reduced to writing and run from said Kensington to said Sturges, who, it was agreed, should immediately assign the same to said John V. Farwell, with the understanding that the said Sturges' one-quarter interest should be held by said Farwell to pay him, said Farwell, all indebtedness owing him by said Sturges, and that whatever was left over was to go to Mrs. William Sturges—the said Bessie McLeod Sturges.

The court further finds that it is not clear from the evidence whether or not the one-quarter interest to go to said

William Prescott was for his benefit or for that of John V. Farwell, representing the syndicate.

And the court further finds that said rebate agreement was made by said John V. Farwell for and on behalf of and for the benefit of said syndicate.

The court further finds that in the preliminary organization of the Capitol Company, Sturges was made one of its directors, which place he resigned on the 21st of August, 1885, and by power of attorney of the same date, Sturges was authorized to act for John V. Farwell in his absence, the said Farwell having theretofore been elected a director of said company. That said Sturges did represent said Farwell at several meetings of the board of directors by virtue of said power of attorney up to the 21st of July, 1885. That about the first day of September, 1885, the said Farwell returned to America, leaving Sturges in England, under said power of attorney, as his representative in said board of directors, and also looking after the interests of the syndicate in connection with the affairs of the said Capitol Company; that said Sturges remained in England, assisting in efforts to float the new company and looking after the interests of the syndicate.

The court further finds that the debentures were sold by Kensington & Company with reasonable rapidity, and the, success of the scheme appeared to be very promising.

The court further finds that immediately on his return to America said Farwell commenced importuning said Sturges by letter to get the rebate contract executed and forward it to him; that he made repeated unsuccessful efforts of that kind until January, 1886, when he, in company with the late Judge Drummond, sailed for England.

Shortly after the arrival in England of said Farwell and said Judge Drummond, Kensington demanded of Farwell a conveyance of certain shares of stock before the time he, Farwell, thought Kensington & Company were entitled to the same, which demand Farwell refused, and in turn demanded of Kensington the execution of the rebate agreement. Kensington refused to execute any such rebate

agreement, and thereupon Kensington & Company's power to sell said bonds was revoked.

The court further finds that the execution of the Kensington fifty per cent contract and of the rebate agreement had been kept a profound secret by the parties interested, from the officers and directors of the Capitol Company and its debenture holders, and that to have made the same then public, would have resulted in stopping the sale of the debentures and probably in the ruin of the company, and also would have resulted in very serious injury to the syndicate because of their guaranty in connection with the debentures, of which about 400,000 had then been issued; that John V. Farwell thereupon contemplated the abandonment of a London corporation and a new reorganization in America, but before taking any steps in that direction he was induced by Sturges, Drummond and others, to get rid of Kensington & Company, if possible, by buying out their interest under their two contracts.   It appears that either because Farwell thought Sturges was a better person to make the negotiation, or because Sturges represented to Farwell that Kensington was so angry with Farwell that he would not treat with him, that he, Sturges, was selected to make the purchase.   Sturges negotiated with Kensington with the result that for 16,000 pounds in debentures of the Capitol Company, furnished him by John V. Farwell, he purchased both the two per cent and the fifty per cent Kensington contracts, and took an assignment thereof to himself.   At or about the same time, and as a part of the same transaction, William C. Prescott executed an assignment of his interest in the fifty per cent contract to Sturges, in which it is stated that such interest was one-quarter interest.   For this latter assignment but a nominal sum (about five pounds) was paid.   The Capitol Company immediately appointed a large number of agents throughout Great Britain, and commenced to push the sale of the debentures, principally through the efforts of its secretary, the said Prescott, assisted by its board of directors.   The company having organized its corps of agents, and meeting with rea-

sonable success in the sale of the debentures, John V. Far-
well and Sturges, together with Judge Drummond, in April,
1886, departed for America. It appears that upon the
purchase of the Kensington contracts being consummated,
Sturges wanted to know of John V. Farwell what he was
going to allow him, Sturges, as compensation for his serv-
ices, but Farwell evaded the question by saying he intended
to be more liberal with him than he, Sturges, could expect.
In April, 1886, a few days after their arrival in America,
Farwell requested Sturges to deliver over to him the Ken-
sington contract, which Sturges refused to do, and claimed
that he, Sturges, owned the same, or fifty per cent thereof.
It appears that April 22, 1886, John V. Farwell, in order to
avoid any discussion then as to the matter (his partners in
the syndicate apparently being ignorant of the claim of
Sturges), offered to put in writing his (Farwell's) view of
the then situation, and of the amount in stock Sturges should
receive when the whole matter should be floated, and Sturges
to do the same, Mr. Buckingham to hold Sturges' statement,
and Judge Drummond to hold Farwell's, and in the case of
the death of either before settlement should be made, the
said two parties to break the seals and decide between
Farwell and Sturges, with power to choose an umpire if
they disagreed.

The court further finds that interviews were had, in which
all of the syndicate and Sturges participated, and that
Sturges claimed at that time one-half of the Kensington
fifty per cent contract, and made some threats as to what
he would do if his claim was not allowed, or some arrange-
ment made for settling the same by arbitration. It appears
that Sturges left rather suddenly, pending the negotiations,
and went to New York City, but Farwell got the approval
of Judge Drummond to an arbitration agreement which had
been talked of, and sent it on to New York City to Sturges
with the request that he would execute the same and return
it. Sturges not doing so, John V. Farwell, who was at that
time a very sick man, went to New York, and the arbitra-
tion agreement, dated May, 1886, was signed by John V.

Farwell and William Sturges, and was indorsed on the bottom, 'The above is satisfactory to me.  (Signed), C. B. Farwell.'  It does not appear why the other members of the syndicate did not sign the agreement.  The said arbitration agreement apparently assumes that the said John V. Farwell, upon the payment of 15,000 pounds, paid Kensington, and provides that the contract shall be indorsed in blank and left in the hands of Drummond and Buckingham 'for the interest of both parties until the business is completed.'

And in the case of disagreement as to a division of the profits to be made on said contract, these two gentlemen were to decide how such division should be made, and declares ' that this contract was and is incomplete as to the interest of said Sturges,' and that the purchase and transfer from Kensington was agreed to by said Farwell on that account and 'for the protection of the interests of all parties.'  It also provides that all equities that might arise thereafter, growing out of the services performed or to be performed by either or both of the parties, should constitute a subject for arbitration.

The court further finds that the Kensington contract was incapable of being carried out according to its terms, and was not so carried out or so acted upon; that said Kensington fifty per cent contract was purchased with no intent or expectation that said Sturges would carry out the same as assignee thereof, but was purchased with the view and expectation that the same should cease and be of no effect, and that this was well known to the said Sturges as well as to the said Farwell.

And the court further finds that said Sturges, at the time of said purchase, stood in a fiduciary relation to the said John V. Farwell and to the said syndicate, and, under the law, could not acquire the ownership or control of said contract adversely to the interests of said syndicate without its consent, and that the burden of showing such consent, with full knowledge of all the facts, was and is upon said Sturges.

The court finds that the presumption of law arising from this fiduciary relation that, when he took the assignment of

the Kensington fifty per cent contract, he took the same for the benefit of his principals (the said syndicate), has not been overcome by any satisfactory proof in this case.

The court further finds that the said Sturges had, by reason of his said fiduciary relation, become possessed of a business secret of his said principals, to wit, the making of said contract and the concealment of the same from the directors of said Capitol Company and its debenture subscribers, the divulging of which secret he well knew could and would be of almost incalculable damage to the said Capitol Company and to the said syndicate, and that he used this knowledge, accompanied with threats to divulge such secret and to commence litigation founded upon its possession of the legal title of said Kensington fifty per cent contract, to force from the said syndicate the said arbitration agreement; that there is no evidence in this case of any law of England violated by the Kensington contract, and no evidence of any intent to defraud any one by so doing; that whatever wrong there was, it laid in the concealment from the board of directors, and from those intending to subscribe for debentures, the knowledge of the existence of such a contract; that whether it was a crime and fraud, or merely a moral wrong in the concealment of the existence of the contract, it was a business secret acquired by an employe in the course of his employment, and a court of equity will not permit such an employe to profit by such improper divulgement, or threat to divulge the same to the injury of the principals, and no admissions made in said arbitration agreement should prevail as against the said syndicate unless corroborated fully by other satisfactory evidence, and any doubt which may exist as to the construction to be placed upon any recitals in said arbitration agreements should be construed as strongly as the language will permit of against the said Sturges under the circumstances. The second arbitration agreement which was made between the parties was obtained by said Sturges in like manner, and by reason of like threats. The third and fourth arbitration agreements merely change the arbitrators who act under the first and second.

The court further finds that said Sturges, after signing said first arbitration agreement, returned to England at the request of said syndicate and rendered service in promoting the sale of debenture bonds until the month of December, 1889, when, the sale of said debentures being practically completed, he returned to America.

The court finds that Sturges had several other schemes in which he was interested on hand during said time, and that while he did not give all his time to the sale of said debentures and looking after the interests of said Capitol Company and said syndicate, he did give the necessary time thereto, and was diligent and faithful in the discharge of his duties in that connection. That during said interval said John V. Farwell made several trips to England upon the affairs of said syndicate and of said Capitol Company, and rendered efficient services. That in all he spent more than two years of said time in England.

The court further finds that in June, 1889, while said Farwell was in England, the said Sturges, by threats of lawsuit concerning a certain indorsement of said Farwell of a certain $40,000 note, the negotiation of which said Farwell had stopped, and by threats against the said Capitol Company made by said Sturges, forced said Farwell into making a loan of $140,000 to the said Sturges, running for one year, with interest at six per cent per annum, for which said Sturges gave his promissory note, with power of sale of certain collaterals, to wit, 6,136 shares of the stock of said Capitol Company belonging to his wife, Bessie McLeod Sturges, and seven shares of the Sonora Land Company, the said loan having apparently been made to enable said Sturges to purchase a controlling interest in said Sonora Land Company; that in an agreement made at the time of making said loan it was agreed between said Sturges and said Farwell that said advance of money ($140,000) so loaned should be made an element for consideration in the arbitration between said Sturges and said syndicate, growing out of the Capitol Company's business in London in its final execution by themselves or by the arbitrators, as the case

might be, and in the said agreement it was, among other things, provided that said Sturges should 'neither do nor say anything that is not to the interest of the Capitol Company nor enter into any suits directly or indirectly.'

The court further finds that said first arbitration agreement was never signed by said Taylor, and that said Taylor and said Farwell notified said Drummond, with whom the said Kensington fifty per cent contract was deposited, not to part with said contract, as they claimed it to be the property of the syndicate, and thereby caused the failure of said first arbitration agreement; that by reason thereof said John V. Farwell went to England and was forced by threats of suits and of the ruin that he, Sturges, would cause the said Capitol Company enterprise, into a second arbitration agreement, by which Lord Thurlow, one of the directors, and Mr. Frank Crisp, the solicitor of the Capitol Company, were made arbitrators. The parties afterward, in order to have the arbitration in America, on August 18, 1887, entered into a third arbitration agreement, making Walter Potter and Columbus R. Cummings arbitrators, with Judge Drummond as umpire. After efforts on the part of the syndicate to postpone the arbitration, the death of Judge Drummond necessitated, apparently, the making of a fourth arbitration agreement, which was entered into September 23, 1890, naming E. M. Phelps, J. W. Doane and Lyman J. Gage in place of the arbitrators named in the third agreement.

The court further finds that none of the said arbitration agreements were ever carried into effect, and that the failure to do so was caused by the syndicate or some one or more members thereof.

The court further finds that at the time the third arbitration agreement was made there was also what were known as addenda 'A' and 'B.' In the former it was agreed that the arbitration should not be had or decision made until the remaining debentures of the Capitol Company should be sold, and that by addendum 'B' the said John V. Farwell, in consideration of the postponement of the arbitration until all the said unsold debentures of the Capitol

Company should be disposed of, releases the said Sturges 'from all obligation due said John V. Farwell on account of previous contracts amounting to over $100,000, and also delivers to him 150,000 Gogebic bonds as an advance payment on the said award, and agrees to deposit with George F. Westover certain Excelsior Bessemer ore stock to apply at its valuation upon said award at the time said award should be made.' It is admitted that said Bessemer ore stock is now of no value.

The court further finds that the contention of said Sturges, that by said addendum 'B' the said Farwell, solely for the consideration of said postponement, released him from all said obligations amounting to over $100,000, can not be maintained; that under the circumstances under which said addendum 'B' was made, and under the other facts in this case, it would be inequitable not to allow credit for said obligation so released as an advance payment upon the accounting between the said syndicate and said Sturges in regard to the matters aforesaid.

The court further finds that there is no proof in this case that said Farwell refunded to the said syndicate the 15,000 pounds mentioned in the first arbitration agreement, and that the subsequent arbitration agreements assume that all the members of said syndicate are liable in regard to the matters aforesaid, and the court so finds, notwithstanding any agreement or understanding that did or may exist between the members of said syndicate in that regard, as to which latter agreement or understanding this court makes no finding.

The court further finds that the said Kensington contracts were purchased of said Kensington for cancellation, and that although the said Capitol Company was, by the said Sturges, on September 28, 1886, notified of the assignment of the two per cent contract to said Sturges, and its board of directors agreed to accept him in place of Kensington, he, the said Sturges, 'undertaking to produce the transfer at the next board meeting,' it does not appear from the evidence that said transfer was ever produced to said board until the 13th

of January following, when it appears from the minutes of
said board that the said two per cent contract canceled by
said William Sturges was laid on the table, and the cancel-
lation ratified by the board of directors.

And the court further finds that the said Sturges performed
no services for said Capitol Company under said contract,
and is entitled to no claim against said company by reason
of said transfer.

The court further finds that no agreement or understand-
ing was ever had between said Sturges and said syndicate as
to the compensation for his services rendered in and about the
promotion and organization of said Capitol Company, or in
or about its business or its interests, or for or on behalf of
his services rendered to said syndicate in connection with
said Capitol Company, or in or about the interests of said
syndicate in the matters aforesaid, except as hereinbefore
stated.

And the court further finds that said Sturges does not
own the said fifty per cent Kensington contract, but that
said syndicate is the equitable owner thereof, and that the
same, upon compliance of said syndicate with this decree,
should be canceled and delivered to said syndicate.

And the court further finds that had the said Kensington
fifty per cent contract, as modified by the said rebate agree-
ment, been carried out, he, the said Sturges, would have been
entitled to have and receive for all his services in the promo-
tion and organization and in the business of the said Capitol
Company, from the year 1884 up to the time the one million
of debentures issued by the Capitol Company should be sold,
one-quarter of all the profits realized under said Kensington
fifty per cent agreement, to be paid in shares of the said
Capitol Company as provided in said Kensington fifty per
cent contract.

The court further finds that at the time of the execution
of the said Kensington fifty per cent contract, and at the
time the same was purchased by said Sturges with the
bonds furnished by said syndicate, he, the said Sturges, still
owned an undivided one-quarter interest, which he had

agreed with the said John V. Farwell should be assigned to, and held by said John V. Farwell to pay his, the said Sturges', debt to said Farwell, amounting to over $100,000, and the remainder, if any, should be held by said Farwell for the benefit of the said Bessie McLeod Sturges, the wife of said William Sturges. And the court further finds that said Sturges, having consented that said last named contract should be purchased for cancellation, it became impracticable to carry out its provisions, and ascertain what number of shares of said Capitol Company, he, said Sturges, would be or was entitled to as owner of one-quarter interest therein, and that under the circumstances, in equity and good conscience, said Sturges is entitled to receive from said syndicate, for the use of his wife, the said Bessie McLeod Sturges, the value of said one-quarter interest over and above the obligations due from said Sturges to said Farwell, upon other and prior contracts between them, such value to be as of the time the said fifty per cent contract was so purchased for cancellation.

And the court finds that this court is not limited to finding the value of said one-quarter interest in shares of stock at the time of said purchase, but may and should find its value in money.

The court further finds that said Sturges' one-quarter interest was then worth, over and above the said debts due from said Sturges to said Farwell, the sum of $75,000, and that said syndicate should account for and pay the said Bessie McLeod Sturges the said sum of $75,000.

That because of the wrongful act of said Sturges in claiming to own said Kensington fifty per cent contract, and the use he made of the legal title being in him as hereinbefore substantially set forth or referred to, no interest should be paid on said sum, except from the date of this decree.

The court further finds that said Sturges is entitled to compensation for his services in selling the remainder of the bonds unsold at the time of the purchase of the fifty per cent contract, and for his services rendered in regard to

the business of said Capitol Company; that while he did not have the power given to Kensington under the fifty per cent contract, nor the liability for expenses, he did take the place of the said Kensington as to looking up investors and promoting the sale of said bonds; that, not including the one hundred thousand pounds of the Potter, Lovell & Co. bonds, transferred to the syndicate through Sturges' efforts, the amount of bonds remaining unsold when the Kensington fifty per cent contract was purchased, and subsequently sold by his agents and through the office, was about 498,814 pounds.

And the court further finds that said Sturges, from March, 1886, rendered other services for the benefit of said syndicate, distinct and independent of said services in selling said last named bonds, and also from early in the year 1884, rendered other services to said syndicate, and that said services consisted in specially representing the interest of said syndicate, and acting as its agent, for which he is entitled to compensation, and that said last named services commenced in the year 1884, and ended in the year 1889, and were continuous except for a few months of said time.

And the court finds as to the $25,000 received from the Travers sale of part of the Grace Furnace property, about $18,000 of which was deposited with John V. Farwell & Company to the credit of said John V. Farwell, that said Farwell is entitled to retain out of the same the amount due upon a certain promissory note for the sum of $10,000, executed by said Travers, payable to the order of said John V. Farwell, and that the said William Sturges is entitled to the remainder of the said sum of $18,000.

The court further finds that said Gogebic bonds delivered to said Sturges for said Farwell, as mentioned in said addendum 'B,' had no appreciable value, and said John V. Farwell nor said syndicate are entitled to any credit therefor as against said William Sturges; that neither the said syndicate nor the said John V. Farwell is entitled to any credit on account of the transfer by said John V. Farwell

of his interest in the Grace Furnace Company to Walter Potter or to the said William Sturges.

And the court further finds that the said William Sturges is entitled to have and recover of the said syndicate, over and above all just credits and off-sets, either of said syndicate or of said John V. Farwell, for or on account of the matters aforesaid, including therein the balance due said Sturges on said $18,000, but independent of the amount found due Mrs. Bessie McLeod Sturges as aforesaid, the sum of one hundred and ten thousand five hundred and ninety dollars and forty-three cents ($110,590.43), to be applied as a credit upon said note of $140,000.

And the court further finds, as to the said eighty lots in said Smith Moore's Addition, that said William Sturges makes no claim to the same, and admits the ownership of the same to be in said Bessie McLeod Sturges, and that, as between her and the said John V. Farwell and the said Richard Travers, the said Bessie McLeod Sturges is the owner thereof, and is entitled to have and receive from the said John V. Farwell a quit-claim deed thereof, with covenants of warranty against his, said John V. Farwell's, own acts, upon the payment or tender to said John V. Farwell of the sum of $3,996.82, paid by said Farwell for taxes upon said lots, with interest thereon from the date of this decree. She, the said Bessie McLeod Sturges, having had the benefit of said payment of taxes, but the same not having been made at her request, she should pay no interest thereon except as aforesaid.

It is therefore adjudged and decreed that the said John V. Farwell, Charles B. Farwell and Abner Taylor pay to the said Bessie McLeod Sturges, within ninety days from the entry of this decree, the sum of $75,000, with interest thereon from the date of the entry of this decree at five per cent per annum, and that, upon the payment thereof, the said contract between the said Farwells and Taylor, of the one part, and Kensington & Company, of the other part, dated July 13, 1885, be canceled and delivered up by the clerk of this court to the said Farwells and Taylor.

It is further ordered, adjudged and decreed that there is due and owing from the said Abner Taylor to the said William Sturges in full for all services rendered as aforesaid on account of the matters and things aforesaid, and submitted to the court as aforesaid, the sum of one hundred and ten thousand five hundred and ninety dollars and forty-three cents ($110,590.43), to be credited upon the certain promissory note of $140,000, dated the 24th day of June, 1889, payable one year from its date with interest at six per cent per annum and secured by collateral securities, to wit, 6,136 shares in the Capitol Freehold and Investment Company of London, said shares being ten pounds sterling each, and being the property of the said Bessie McLeod Sturges; and seven shares of the Sonora Land Company, of Chicago, the property of the said William Sturges.

And it is further ordered, adjudged and decreed that there is due and owing to the said John V. Farwell and for the benefit of said syndicate upon said promissory note for $140,000, the sum of twenty-nine thousand four hundred and nine dollars and fifty seven cents ($29,409.57), and that the said William Sturges pay said last named sum to the said John V. Farwell for the use as aforesaid, within ninety days from the entry of this decree with interest from the entry of this decree at the rate of five per cent per annum; and that unless said William Sturges, or some one in his behalf, shall pay to said John V. Farwell for the use, etc., the said sum of twenty-nine thousand four hundred and nine dollars and fifty-seven cents ($29,409.57), with interest as aforesaid, within ninety days from the date hereof, the said collateral securities shall be sold at public sale by Jeremiah Leaming, a master in chancery of this court, upon giving thirty days' notice of such sale in the Chicago Legal News for three successive publications, giving the time and place of such sale, and the description of said securities, which place shall be at the judicial salesrooms of the Chicago Real Estate Board, No. 57 Dearborn street, in the city of Chicago, in the said county of Cook, the said master first offering for sale the

said seven shares of Sonora Land Company, such sale to be to the highest bidder for cash, each party hereto having the privilege of bidding therefor, and without redemption, and upon said sale being made and the confirmation thereof, the said master shall execute proper and sufficient bills of sale and transfers of the same to the purchaser or purchasers thereof, respectively, and said master shall report to the court said sale, and upon the confirmation of such sale, if there shall be any deficiency or difference between the proceeds of said sale and the amount due on said promissory note as fixed by this decree, the said John V. Farwell shall have judgment against the said William Sturges for the amount of such deficiency; and if the amount so found due to the said Farwell for the use, etc., on said $140,000 promissory note, by this decree, with interest as aforesaid, shall be paid before said sale, together with the master's costs and expenses, if any, the said 6,136 shares of stock shall be delivered to the said Bessie McLeod Sturges, or to her order, or to her solicitor in this case, and the said seven shares of the Sonora Land Company shall be delivered to said William Sturges, or to his order, or to his solicitors; and if there should be a satisfaction of this decree by a sale of said collateral less than the whole, the remainder of such collaterals unsold shall be delivered to the parties to whom they are decreed to belong, as aforesaid.

It is further ordered, adjudged and decreed that said Sturges is not indebted to said John V. Farwell, Charles B. Farwell and Abner Taylor, or either of them, for or on account of the matters in controversy aforesaid (except said sum of $33,609.57 so found due as aforesaid on said promissory note of $140,000, and as to the said matters in controversy aforesaid the amount hereinbefore ordered credited to said Sturges on said $140,000 note, is all the indebtedness of said John V. Farwell, C. B. Farwell and Abner Taylor, or either of them, to him, the said William Sturges.

It is further ordered, adjudged and decreed that neither said William Sturges nor the said Bessie McLeod Sturges have any claim or demand against the said Capitol Free-

hold Land and Investment Company, of London, or the shares of its stock, except as to the said 6,136 shares as aforesaid, owned by the said Bessie McLeod Sturges, and pledged as collateral security to the said John V. Farwell as aforesaid.

It is further ordered, adjudged and decreed that the said John V. Farwell, shall, upon the payment to him of the said sum of $3,995.62, with interest at five per cent per annum, from the date of this decree, shall quit-claim, with covenants of special warranty against his own acts, all his right, title and interest in and to the said eighty lots in the said Smith Moore's addition to the city of Marquette, which are described as follows, to wit: Lots Nos. 1 to 19, inclusive; lots 30 to 64, inclusive; lot 79; lots 82 to 101, inclusive; lots 130, 131, 132, 134 and 136.

It is further ordered, adjudged and decreed that execution may issue or other process usual to courts of chancery may issue, to enforce this decree upon motion therefor, if the same become necessary, and that each party pay its own costs and charges in this cause."

TENNEY, CHURCH & COFFEEN, attorneys for plaintiff in error; S. P. SHOPE, of counsel.

THOMAS A. MORAN and HENRY S. MUNROE, for Bessie McLeod Sturges and James H. Wilkerson, Adm'r, defendants in error.

MR. JUSTICE SHEPARD DELIVERED THE OPINION OF THE COURT.

It is apparent, we think, from the decree of Judge Tuley, that there were no other agreements of submission to him than such as are recited in his decree, and we can not, therefore, properly consider the paper that is certified to us and called a supplemental record.

The decree, therefore, with the agreements therein set forth, will be treated by us as constituting the entire record before us.

It is next urged with much persuasiveness that the decree

Farwell v. Sturges.

must be reversed because the agreements set out therein were not "entered of record," as said in the statute, and that their failure "to be entered of record." goes to the jurisdiction of the judge to hear and determine the matters so attempted to be submitted.

There is not a great deal of room for argument upon that question. It is purely a matter of construction, if, either read alone or in connection with other provisions of the act, it is uncertain whether, used parenthetically, as they are, the words, " to be entered of record," are jurisdictional words, or words merely of direction.

Upon their first reading an impression is created that they are jurisdictional, but upon a more attentive consideration of them in connection with the last clause of section 1 of the act, and considering them, as expressed, in the form of a parenthesis to the substance of the clause in which they occur, it would seem as though the whole purpose of the words was to express to the clerk of the court in which the substantive written agreement was filed, authority or direction to enter that agreement of record.

The last clause referred to of section 1, is, that when the agreement shall be signed by the parties, not when it shall be signed and entered of record, it " shall be of binding force upon the parties thereto in all the courts of this State."

The duty of recording papers filed in court does not attach to the judge, but to the clerk under the direction of the judge or the direction of the law, and the judge, or the court, can not be deprived of jurisdiction by the failure of the clerk to perform his duty.

And such duty failed in or neglected for a time, might be fulfilled by a later compliance. It being, therefore, the duty of the clerk to enter the agreement of record (not a jurisdictional, but a clerical act or duty), we think it was sufficiently complied with when the agreement was spread of record, although for the first and only time, as a part of the decree.

The second paragraph of section 1 of the act in ques-

tion requires that the decree shall contain a statement as to what matters in controversy were submitted, and that such statement thereof shall be conclusive. Such a statement may well consist of a full recital and setting forth in the decree of the agreements, in terms, as was here done.

The jurisdiction, then, of the judge being lawfully acquired as to all matters submitted to him, the more serious question arises as to whether the decree, which gives to Bessie McLeod Sturges the benefit of money found by the decree to be due from the appellant to William Sturges, can be sustained.

The agreement of submission, dated May 23, 1892, as set forth in the decree, is signed by John V. Farwell, Charles B. Farwell, Abner Taylor, The Capitol Freehold Land and Investment Company, of the one part, and by William Sturges, of the other part. Bessie McLeod Sturges did not sign that agreement and is not mentioned in it except to reserve from its operation and effect the matters at issue between herself and John V. Farwell in a certain cause pending in the Federal Court.

The subsequent agreement, dated September, 1893, between Bessie McLeod Sturges and John V. Farwell, concerning the dismissal of her suit then pending in Michigan, and subjecting the matters there in controversy to the adjudication of Judge Tuley along with the matters included in the agreement of May 23, 1892, was signed by Bessie McLeod Sturges, but was not signed by, and did not purport to be made by, or with, the appellant, Charles B. Farwell, and, of itself, was not in pursuance of the form prescribed by the statute.

Nevertheless, and notwithstanding the appellant, Charles B. Farwell, never united with Bessie McLeod Sturges in a submission of matters in controversy, if any there be between him and her, he, together with John V. Farwell and Abner Taylor, was decreed to pay to her the sum of $75,000 with interest, and it is because thereof that he complains.

Now, if that sum of money had been decreed to be paid to William Sturges, or, in other words, if the decree had confined itself to an adjudication between the parties, by name,

who signed the submission agreement, we apprehend no fault of lack of jurisdiction would have been urged against the decree.

In considering the question we must determine what the nature of the proceeding was. That matters which, under our system, are cognizable either at law or in equity, as the case may be, were meant by the statute to be susceptible of submission, is, we think, apparent from the language used.

"A judgment (at law), or decree" (in equity), are words that are repeated so often, and in such connection, and always together in the statute, as to repel all presumption of their being naked words of arbitration, and conclusively to demonstrate that the proceeding was intended to be one controlled by either legal or equitable rules and principles as the facts should warrant.

Looking, then, at the decree, it is apparent that the matters involved were peculiarly subjects of equitable determination.

The question then is, whether moneys found to be equitably due from one to another of the parties to the proceeding may be ordered, in a suit in equity, to be paid to one who is not a party to the suit, but who, as between herself and the party to whom the money is found to be due, is equitably entitled to it.

The decree reads:

"That under the circumstances, in equity and good conscience, said (William) Sturges is entitled to receive from said syndicate, for the use of his wife, the said Bessie McLeod Sturges, the value of said one-quarter interest over and above the obligations due from said (William) Sturges to said Farwell. * * * The court further finds that said (William) Sturges' one-quarter interest was then worth, over and above the said debts due from said (William) Sturges to said Farwell, the sum of $75,000, and that said syndicate should account for and pay the said Bessie McLeod Sturges the said sum of $75,000. * * * It is therefore adjudged and decreed that the said John V. Farwell, Charles B. Farwell and Abner Taylor pay to the said Bessie McLeod

Sturges, within ninety days from the entry of this decree, the sum of $75,000, with interest," etc.

What the "circumstances" were which furnished the basis for the finding by Judge Tuley that "in equity and good conscience" William Sturges was entitled to receive anything for the use of Bessie McLeod Sturges, is not shown, and under the statute would not be a matter for review, if shown.

We are concerned only with whether, upon such a finding, Judge Tuley had the power to order the money paid to Mrs. Sturges.

It is not uncommon in equity to order money that is found to be due from one party to another to be paid to a third person who is not a party to the suit.

Take for instance the cases of receivers, sheriffs, intervening petitioners and beneficial usees generally.

The rules of practice in equity in the Circuit Courts of the United States provide that "Every person not being a party in any cause who has obtained an order, or in whose favor an order shall have been made, shall be enabled to enforce obedience to such order by the same process as if he were a party to the cause; and every person not being a party in any cause against whom obedience to any order of the court may be enforced, shall be liable to the same process for enforcing obedience to such order as if he were a party in the cause." 2 Beach on Modern Eq. Pr., 1075, rule 10.

We cite this rule not as authority but to show the practice.

In Grant v. Baronis, 97 Cal. 496, it is said:

"In an action for specific performance of an agreement to convey land, a court of equity has power, by its decree, as against the parties who are before it, to enforce all the terms of the agreement. If the vendor's agreement is that his conveyance shall transfer the title free of incumbrances, the court can direct the application of the purchase money to the satisfaction of those incumbrances, and for that purpose can cause the money to be brought into court

and disbursed under its direction.   If the holders of those incumbrances are before the court, they will be bound by the direction of the court, and their claims would be satisfied by a satisfaction of the judgment.

"If the amount of the incumbrances is ascertained, and the court finds that the liens therefor can be discharged by mere payment thereof, it can direct that the payment be made directly to the holders of the incumbrances even though they be not before the court, instead of to the vendor.   So long as the vendor incurs no liability, and is freed from any personal claim for the amount of the incumbrances, he will not be heard to object to the application of the purchase money for the purpose of making good his agreement with the vendee."

The same principles are frequently alluded to in cases where the question has arisen of who may avail themselves of error in a decree that directs money or property to be paid or delivered to persons who are neither parties nor privies.   Freeman on Judgments (2d Ed.), Sec. 174; Ransom v. Henderson, 114 Ill. 528; Farnam v. Borders, 119 Ill. 226; Phenix Mut. L. Ins. Co. v. Batchen, 6 Ill. App. 621.

As between the appellant and William Sturges, the objection to this decree would have no standing.   It would be final and binding upon both parties.   It would measure the extent of appellant's obligation to William Sturges, and its payment would effectually and forever discharge appellant. Although the decree wherein it directs the money to be paid to Mrs. Sturges would have been more professionally artistic in form if it had followed the finding and made the money payable to William Sturges for her use, that inadvertence or omission is one that reaches the form alone.

In substance that is what it is.   The whole decree makes it plain.   No possible injury from such an omission in form can ensue to the appellant.

The decree binds William Sturges as a party to the submission; it binds Bessie McLeod Sturges if she accepts it, and it protects the appellant against them both from any further claim against him; and if, as has been suggested, the

appellant has claims against her personally, it would seem such might yet be set off against this decree.

The great importance of the questions presented by this record, and because they are new, is a sufficient excuse for embodying the whole record along with our imperfect reasons.

The decree of Judge Tuley is affirmed.